## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

     *Plaintiff*,

vs.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights
Division, in her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO
FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and
ERIC ARTIS, as members of the Colorado Civil Rights
Commission, in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official
capacity;

     *Defendants*.

---

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE
## RELIEF

---

## I.     INTRODUCTION

1.     XX-XY Athletics is an athletic-apparel retailer with a distinct message and a distinct mission. It exists to empower women and protect women's sports and women's spaces. From its name to its apparel to its advertising, the company relentlessly expresses the view that women deserve their own sports. As one of the company's advertising campaigns says, "Real Strength. Real Courage. Real Girls Rock." This message and the company's mission are grounded in the belief that men and women are physiologically different; sex is binary, biological, and immutable; women deserve the chance to be champions in their own sports. Real Girls Rock.

2.    To get that message through the noise, XX-XY Athletics uses its platform to draw attention to men and boys who compete in women's sports. And XX-XY Athletics refers to them with masculine pronouns and terms, often using their given name, rather than their chosen names. The company believes that doing otherwise would perpetuate a lie (that sex can be changed) and defeat its mission (to show the injustice of males competing in women's sports).

3.    For example, XX-XY Athletics recently published a video on X protesting a male athlete competing in girls' high-school track in Pennsylvania with the following text: "Sean 'Luce' Allen is having a track season to remember. Meanwhile girls are receiving a message they'll never forget. When boys run girls' track, they win. *And girls lose.*" The video refers to the athlete as a "boy" and uses the athlete's given name, Sean. These references are integral to the company's message that men are men, men cannot become women, and men should not play women's sports. Compelling XX-XY Athletics to say otherwise would defeat its message.

4.    Consider what XX-XY Athletics' March 2024 video advertisement would look like if the company could *not* refer to male athletes as "male," "men," or "boys." The video ad depicted a transgender-identifying male athlete spiking a volleyball in a high-school girls' volleyball game and striking Payton McNabb, a high-school girl, in the face, causing serious neurological damage and partial paralysis. Over this depiction, the voiceover stated, "stand up if you know that it isn't fair or safe to allow males to compete in girls' sports." Edit out the word "males," and the ad makes no sense. Being able to speak about biological reality is thus critical to XX-XY Athletics' ability to promote its message. And compelling XX-

XY Athletics to use language other than "male," "men," or "boys" to describe male athletes changes its whole message.

5.    Colorado officials, however, hold a different view. Colorado recently passed HB25-1312 and amended the Colorado Anti-Discrimination Act (CADA) to define "gender expression" to include "chosen name" and "how an individual chooses to be addressed." The Act then declares that Coloradans have a right to access "public accommodations[] and advertising" free of discrimination on that basis. This expresses the legislature's intent that it be illegal for public accommodations like XX-XY Athletics, in their advertising, customer interactions, and elsewhere, to refer to transgender-identifying individuals with their given names or with biologically accurate language. XX-XY Athletics can no longer speak the truth in pursuit of its mission. XX-XY Athletics can no longer call men, men.

6.    Even worse, the Act coerces the company to speak against its principles and alter the meaning of its core message. If XX-XY Athletics refuses, the company faces cease-and-desist orders, expensive investigations, hearings, and civil and criminal penalties. Colorado officials have not hesitated to go after businesses for violating the same law in the past, torching the First Amendment in the process. XX XY Athletics faces an imminent threat of enforcement as it will continue to speak in a manner consistent with its desired message and views.

7.    Whether men should be allowed to compete in women's sports is a political and cultural question of great importance. The government has no need or right to compel or silence speech to place a thumb (or an anvil) on one side of that debate. Our Constitution demands better. It gives women and every American the right to speak the truth. XX-XY Athletics asks for that right to be restored in Colorado.

## II.    JURISDICTION AND VENUE

8.    This civil-rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983.

9.    This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

10.    This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims herein occurred within the District of Colorado and all Defendants reside in the District of Colorado.

## III.    IDENTIFICATION OF PLAINTIFF

12.    Committee of Five, Inc. is a corporation organized under Delaware law.

13.    Committee of Five, Inc. does business under the name XX-XY Athletics.

14.    Committee of Five, Inc.'s trade name filed with the Colorado Secretary of State is XX-XY Athletics.

15.    XX-XY Athletics' principal place of business is in Colorado.

## IV.    IDENTIFICATION OF DEFENDANTS

16.    Aubrey C. Sullivan is Director of the relevant division of Colorado state government known as the Colorado Civil Rights Division ("Director"), Colo. Rev. Stat. § 24-34-302, and has authority to enforce the law at issue. *See* Colo. Rev. Stat. §§ 24-34-302, 24-34-306. She is named as a defendant in her official capacity.

4

17.     Commissioners Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade Rose Kelly, and Eric Artis are members of the Colorado Civil Rights Commission (the "Commission") and have authority to enforce the law at issue. *See* Colo. Rev. Stat. §§ 24-34-305, 24-34-306, 24-34-605, 24-34-707. They are named as defendants in their official capacities.

18.     Colorado Attorney General Phil Weiser has authority to enforce the law at issue. *See* Colo. Rev. Stat. § 24-34-306. He is named as a defendant in his official capacity.

19.     All Defendants reside in the District of Colorado.

## V.     STATEMENT OF FACTS

***Jennifer Sey founded XX-XY Athletics to protect women's sports.***

20.     Jennifer Sey is the founder and CEO of XX-XY Athletics.

21.     Sey is a national gymnastics champion, best-selling author, award-winning documentary filmmaker, and former chief marketing officer and Brand President of one of the largest clothing companies in the world, Levi Strauss.

22.     Sey has long believed it is important for her to use her platform to speak inconvenient truths and stand up for women and children. That's why in 2008, she wrote the book *Chalked Up*, exposing the abusive coaching practices in elite gymnastics from her own experience. She continued this work by producing *Athlete A*, a 2020 Netflix documentary exposing the USA Gymnastics sex abuse scandal.

23.     After she spoke against COVID-related school closures on a national conservative news program, she faced pushback. Sey chose to retain her voice and left Levi Strauss in February 2022.

24.     Even before she left Levi Strauss, Sey recognized the growing trend of transgender-identifying male athletes competing in women's sports. She knew the biological advantages men had over women in athletics and understood the injustice and danger of allowing men to compete against women.

25.     Specifically, Sey understood that biological sex is a primary determinant of athletic performance, and that puberty blockers and cross-sex hormones do not nullify the physical advantages that men and boys have in athletics. She also understood that the physical advantages of men and boys in sports threatened the safety of women and girls.

26.     While Sey encountered the dark side of elite athletics, she also experienced the benefits of Title IX, legislation passed to protect and advance girls' sports. Sey began gymnastics two years after Congress passed Title IX and has witnessed the many ways the law has empowered female athletes. She desires for all girls, young women, and women to experience those same benefits but witnessed them slipping away through male inclusion in women's sports.

27.     Despite the apparent harms to girls caused by male inclusion in women's sports, Sey also observed that powerful regulators, corporations, and cultural forces silenced any dissent from the practice.

28.     Additionally, many of the legacy athletic clothing brands—recognizable brands with long histories like Nike and Puma—chose to either support this injustice or stay silent. As a former executive of a legacy brand, Sey saw a gap in the market.

29.     Sey was abused as a child athlete, and she regrets that there were not more adults willing to speak out for her safety and protection at the time. With the

rise of male athletes in women's sports, she saw the need to speak out and advocate for women to compete in a category limited to female athletes.

30.    As a former elite athlete, seasoned truth teller, and mother, Sey knew that she needed to speak out again to protect women and girls. And as an apparel industry leader, she also saw an opportunity to use her industry knowledge and skillset to fill the gaps in a market that had refused to speak out.

31.    In March 2024—during Women's History Month—Sey launched XX-XY Athletics in Denver, Colorado. As the name suggests, Sey created the company to give a voice to those advocating to protect women's sports and provide an alternative for consumers disillusioned with the legacy brands that refuse to do the same.

32.    XX-XY Athletics is an online clothing retailer that provides a wide assortment of premium athletic clothing and accessories.

33.    Its collection includes a range of apparel, including tops, graphic tees, hoodies, leggings, shorts, and skirts. It offers apparel in a mix of materials, including cotton, fleece, and high-performance fabrics. It focuses on female apparel but also provides a collection for men.

34.    XX-XY Athletics apparel is available for purchase on its website, xx-xyathletics.com.

35.    In addition to its apparel lineup, the XX-XY Athletics website contains information about Sey, the XX-XY Athletics mission, its employees, and its sponsored athletes.

36.    Even though the company operates primarily online, XX-XY Athletics frequently engages directly with its customers and potential customers.

37.    XX-XY Athletics regularly hosts pop-up shops, which are physical, short-term retail locations.

38.    These pop-up shops are often in Colorado. The brand has hosted pop-up shops at conferences in Colorado like the Steamboat Institute Freedom Conference on August 23, 2024, Colorado Parent Advocacy Network (CPAN) Rocky Mountain Summit on April 6, 2025, the Giving Parents a Voice Townhall on May 1, 2025, and shopping events at their Colorado offices.

39.    XX-XY Athletics anticipates continuing to host pop-up shops in Colorado. One is planned for the Spartan Race in Ft. Carson, Colorado on May 31, 2025, and another at the Colorado State Capitol for the anniversary of Title IX on June 22, 2025.

40.    Sey often hosts the pop-up shops alongside a public speaking event. She and other XX-XY Athletics employees commonly speak with customers and potential customers about XX-XY Athletics and its mission. There were transgender-identifying individuals and advocates present at the May 1 Townhall in Aurora. Sey spoke at the event about why she started the brand, citing "Will Thomas" and "males entering women's sports."

41.    These pop-up shops are often at physical places of public accommodation like the Beck Recreation Center in Aurora, Colorado or the Inverness Hilton in Englewood, Colorado.

42.    XX-XY Athletics communicates with customers and potential customers not only at these pop-up events but also virtually through email, social media, online review boards, and other virtual communication tools.

43.     Sey and other employees also communicate with customers and potential customers in person at speaking events, rallies, and other public engagements.

44.     XX-XY Athletics advertises its brand broadly on the internet, posting advertisements on various websites and social media, as well as its pop-ups and other events.

45.     XX-XY Athletics is active on social media, with accounts on Facebook, Instagram, X, TikTok, YouTube, and other platforms.

46.     Along with Sey, XX-XY Athletics has eight other full-time employees.

**XX-XY Athletics' brand messaging consistently challenges male inclusion in women's sports.**

47.     In addition to its quality offerings, XX-XY Athletics stands apart for its outspoken advocacy for women's sports.

48.     XX-XY Athletics' brand messaging focuses almost exclusively on protecting women's sports from the unfair inclusion of biologically male athletes. It states on its website, "We are unapologetic about our goal. We are here to protect women's sports and spaces."[1]

49.     This messaging pervades all aspects of the company, from its products to its advertising and sponsors.

50.     Most identifiably, the company's title itself references the male-female chromosomal binary. The company included "XX-XY" in its title to reinforce the

---

[1] Our Mission, XX-XY Athletics (last visited May 12, 2025), https://www.xx-xyathletics.com/pages/our-mission.

belief that sex is binary and immutable and that institutions like sports should
reflect those realities.

51.    Much of its apparel also contains messages opposing male inclusion in
women's sports, such as "Save Women's Sports," "Stand Up. Save Women's Sports,"
"Make Women's Sports XX Again," "Real Girls Rock," "Fight for Women's Sports,"
and more.

52.    By selling such apparel, XX-XY Athletics both expresses its own views
on women's sports and provides customers who share those views an outlet to
express those views themselves.

53.    Its advertisements contain similar messages to the messages on the
apparel. For example, in February 2025, XX-XY Athletics launched an advertising
campaign called "Real Girls Rock." As part of the campaign, it released a video that
went viral on X featuring prominent female athletes, such as Riley Gaines and Sia
Liilii, who have spoken out against male athletes in women's sports.[2] The video's
text overlay stated, "Real Strength. Real Courage. Real Girls Rock."

54.    Another video advertisement specifically calls out the competitor Nike.
It depicts girls in athletic wear at sports venues telling Nike, "Today, males are
claiming our identity, our sports, our spaces. Men and boys are stealing
opportunities, medals, trophies, and our futures. It is not fair or just. In fact, it's
awfully dangerous. Yet you refuse to use your platform to stand up …. So we're

---

[2] XX-XY Athletics, *REAL GIRLS ROCK*, YOUTUBE (Feb. 1, 2025),
https://www.youtube.com/watch?v=YWFdHqI34y0.

asking you Nike, … as the biggest voice in all of sports, will you stand up for me? …
Will you just do it?"[3]

55.    One video advertisement shares clips of women and girls playing
sports with the text overlay, "Time to stand up for women's sports. Real women.
Real athletes. Defending Women's Sports."[4]

56.    Another video advertisement depicts footage of Natalie Ryan,[5] a
biologically male athlete, winning a disc golf MVP Open.[6] The video's caption states,
"Does it really make a difference? Yes, it does."

57.    XX-XY Athletics' launch ad called Stand Up, asks the viewer "If you
think it isn't fair or safe for males to compete in girls' sports…" overlaid against
footage of a male volleyball player spiking the ball into female competitor Payton
McNabb's face. [7] McNabb has become an outspoken advocate for the protection of
women's sports since her injury, which has resulted in permanent paralysis on one
half of her face and brain injury.

58.    XX-XY Athletics also partners with several brand ambassadors who
have been outspokenly opposed to men competing in women's sports. Among others,
these ambassadors include Riley Gaines, a former NCAA swimmer who spoke out

---

[3] XX-XY Athletics, *Dear Nike*, YOUTUBE (Oct. 9, 2024),
https://www.youtube.com/watch?v=erMK_NByGf8.

[4] XX-XY Athletics, *XX-XY Athletics – Stand Up*, YOUTUBE (May 14, 2024),
https://www.youtube.com/watch?v=08Tor5UQXK0.

[5] XX-XY Athletics does not know Ryan's given name. XX-XY Athletics often uses a
male athlete's given name if it is known. *See* ¶ 69, *infra*.

[6] XX-XY Athletics (@xx.xyathletics), FACEBOOK (Apr. 6, 2025),
https://www.facebook.com/reel/666794652714686.

[7] XX-XY Athletics, *Stand Up*, YOUTUBE (Apr. 16, 2024),
https://www.youtube.com/watch?v=cg0S2AKyWcQ.

against William "Lia" Thomas, a male athlete, swimming in women's NCAA competitions; Lauren Miller, a professional golfer who lost a first-place title at the 2024 NXXT Women's Championship to James "Hailey" Davidson, a male athlete; and Chloe Cole, an advocate against youth gender transitions who has herself detransitioned.

59.    XX-XY Athletics also hosts a blog, where it frequently shares stories and messages opposed to male participation in women's sports.[8]

60.    Jennifer Sey frequently speaks out publicly on behalf of XX-XY Athletics against male inclusion in women's sports. Through her public appearances, Sey has become a respected and influential voice advocating for fairness in women's sports.

61.    While presenting herself as the voice of XX-XY Athletics, Sey has written articles in the New York Post, the Washington Examiner, the Center Square, The Spectator, UnHerd, The Hill, and Spiked advocating for the protection of women's sports.

62.    While presenting herself as the voice of XX-XY Athletics, Sey regularly appears on television on Fox News and Newsmax and various podcasts including Megyn Kelly and The Clay and Buck Show, advocating for the protection of women's sports.

---

[8] *See*, *e.g.*, Jennifer Sey, *Protect Female Athletes*, XX-XY ATHLETICS (Feb. 5, 2025), https://www.xx-xyathletics.com/blogs/newsroom/jennifer-sey-protect-female-athletes.

***XX-XY Athletics supports advocates who oppose male inclusion in women's sports.***

63.    In October 2024, XX-XY Athletics started the XX-XY Athletics Fund ("Fund"). A portion of all proceeds from XX-XY Athletics goes to the Fund, and the Fund makes donations exclusively to qualified nonprofits that stand up for women's sports.

64.    The Fund primarily provides monetary awards through the Courage Wins award program. The program provides funding and recognition to women and girls who have been harmed by men in women's sports. Award recipients include Stephanie Turner, who was attacked for refusing to compete against a male fencer, and Sia Liilii, who, as team captain of the University of Nevada volleyball team, received public criticism for boycotting a match against a team with a male player.

65.    In December 2024, XX-XY Athletics also started the GXME CHXNGERs program—the first Name, Image, and Likeness ("NIL") program for student athletes speaking up for women's sports. Through the program, XX-XY Athletics compensates college athletes who have spoken out against men in women's sports for their participation in XX-XY Athletics branding and advertisements.

66.    XX-XY Athletics has also released clothing lines for which the company donated a percentage of proceeds to the Independent Council on Women's Sports, the Riley Gaines Leadership Institute, and Gays Against Groomers, all organizations that advocate for the protection of women's sports.

***XX-XY Athletics refers to individuals using language consistent with their sex.***

67.     XX-XY Athletics stands on the following foundational principles, which it publicly asserts on its website: "Sex is binary. Men cannot become women. Women and girls deserve their own spaces. Women and girls deserve safety, privacy and fairness. Sex is the single biggest determinant of athletic performance. If we want to protect the opportunities that Title IX[] afforded women and girls when it was passed in 1972, we need to stand up and stand together."[9] These principles drive XX-XY Athletics to oppose male inclusion in women's sports and otherwise command the company's behavior.

68.     Because XX-XY Athletics constantly speaks out against men competing in women's sports, it frequently references specific transgender-identifying male athletes who compete in women's sports in its advertisements, publications, and public statements. Like all other aspects of the company, its foundational principles dictate how XX-XY Athletics makes these references.

69.     Based on its foundational principles, the company often uses an individual's given name when known, even when it knows the individual uses a preferred name to express a gender identity inconsistent with the person's biological sex. The company often also references the individual's preferred name in quotation marks or other punctuation so the reader can more readily identify the person. It typically uses an individual's preferred name without reference to a given name when it is not aware of the person's given name.

---

[9] Jennifer Say, *I Get Asked All the Time: What Is This Brand About?*, XX-XY ATHLETICS (Feb. 6, 2025), https://www.xx-xyathletics.com/blogs/newsroom/i-get-asked-all-the-time-what-is-this-brand-about.

70.    XX-XY Athletics follows this policy when referring to any individual, including athletes, customers, and public figures.

71.    XX-XY Athletics believes that referring to individuals by their given names is important because it reinforces the belief that sex is immutable and rejects the false concept that a man can become a woman or that a woman can become a man.

72.    In social media posts over multiple platforms, XX-XY Athletics has published posts referring to a transgender-identifying male athlete competing in girls' track in Oregon as "Zachary 'Liaa' Rose."[10]

73.    Similarly, XX-XY Athletics has shared social media content that refers to a transgender-identifying male athlete competing in professional women's swimming events as "Hugo 'Ana' Caldas."[11]

74.    Sey and XX-XY Athletics also publish content referring to a transgender-identifying male athlete who competed in women's NCAA swimming events as "Will" or "William" Thomas, sometimes including his preferred name "Lia."[12]

75.    Sey and XX-XY Athletics publish content that regularly refers to a transgender-identifying male athlete who competes in professional women's fencing

---

[10] *See*, *e.g.*, XX-XY Athletics (@xx_xyathletics) INSTAGRAM (Apr. 18, 2025), https://www.instagram.com/p/DImv1ebOx1R/?utm_source=ig_web_copy_link&igsh= MzRlODBiNWFlZA%3D%3D.

[11] *See, e.g.*, XX-XY Athletics (@xx_xyathletics) X (Apr. 28, 2025), https://x.com/xx_xyathletics/status/1916820318687056281.

[12] *See, e.g.*, Jennifer Sey (@JenniferSey) X (April 1, 2025), https://x.com/JenniferSey/status/1907266773365223878 (reposted by XX-XY Athletics).

as Redmond Sullivan, even though it knows Sullivan uses the preferred name "Annika."[13] Stephanie Turner refused to compete against Sullivan in a women's fencing competition because he is male, and the tournament organizers expelled her for her boycott. XX-XY Athletics awarded her the Courage Wins award for her bravery.

76.     XX-XY Athletics shared one post on X that used the given names of several male athletes competing in California high school girls' track events as follows: Aaron Lester, Henry Hanlon, AB Hernandez, John "Abigail" Jones, Everett "June" Watterson, Cullen "Lily" Javers, and Dom "River" Salinas.[14] It shared this post with the knowledge that these individuals use preferred names different than their given names.

77.     XX-XY Athletics shared another post on X that used the given names of several male athletes competing in women's athletic competitions as follows: Jamison "Jami" Gust, Redmond Sullivan, Zachary "Liaa" Rose, "AB" Hernandez, John "Abigail" Jones, Logan "Natalie" Ryan, Adam "Lucy" Smith, Chris "Harriet" Haynes, Declan "Harriette" Mackenzie, and John Rydzewski aka "Katie Spencer".[15] It shared this post with the knowledge that these individuals use preferred names different than their given names.

---

[13] *See*, *e.g.*, Jennifer Sey (@JenniferSey) X (April 2, 2025), https://x.com/JenniferSey/status/1907571598112198692 (reposted by XX-XY Athletics).

[14] Beth Bourne (@bourne_beth2345) X (Mar. 28, 2025), https://x.com/bourne_beth2345/status/1905663884503253069.

[15] *See* HeCheated.org (@hecheateddotorg) X (Apr. 7, 2025), https://x.com/hecheateddotorg/status/1909401292935749987.

78.     In one Facebook post published by the company, XX-XY Athletics used
the given names of several male athletes competing in women's cycling events as
follows: Kylie (Kyle) Small, Cole Sprague, Lesley (Wesley) Mumford.[16] It made this
post with the knowledge that these individuals use preferred names different than
their given names.

79.     XX-XY Athletics refers to men and boys with masculine pronouns and
terminology and women and girls with feminine pronouns and terminology, even
when it is aware that an individual prefers to use different pronouns or
terminology.

80.     XX-XY Athletics follows this policy when referring to any individual,
including athletes, customers, and public figures.

81.     XX-XY Athletics believes that referring to individuals with
terminology that does not match their biological sex is a lie and reinforces the false
concept that a man can become a woman or that a woman can become a man.

82.     For example, XX-XY Athletics publishes content referring to golfer
James "Hailey" Davidson, who has competed in women's professional golfing events,
as "male" or with masculine pronouns, even though it knows that Davidson
identifies as a woman.[17]

83.     XX-XY Athletics also publishes that consistently refers to disc golfer
Natalie Ryan, who competes in women's professional disc golf events and whose
given name XX-XY does not know, as "a man" or "male," even though it knows that

---

[16] XX-XY Athletics (@xx.xyathletics), FACEBOOK (Jun. 4, 2025),
https://www.facebook.com/share/p/1GtyFfExJX/.

[17] *See*, *e.g.*, XX-XY Athletics (@xx.xyathletics), FACEBOOK (Aug. 28, 2024),
https://www.facebook.com/reel/497417699561906.

Ryan identifies as a woman.[18]

84.    XX-XY Athletics publishes content that consistently refers to high school track athlete AB Hernandez, who competes in girls' track meets and whose given name XX-XY Athletics does not know, as "a boy" or with masculine pronouns, even though it knows that Hernandez identifies as a woman.[19]

85.    In one video advertisement, XX-XY Athletics refers to fencer Redmond Sullivan as a "man," even though it knows that Sullivan identifies as a woman.[20]

86.    In another video advertisement, the company refers to high school volleyball athlete Josiah "India" Clark, who competes in girls' competitions, as a "male[]," even though it knows that Clark identifies as a woman.[21]

87.    Sey often speaks publicly about men in women's sports on behalf of XX-XY Athletics. When she does so, she typically refers to individuals by their given name, if she knows it, and with terminology that matches their biological sex, even when she knows that they identify as a gender different than their biological sex.

88.    For example, she recently spoke at an event at the University of Colorado, Boulder, representing XX-XY Athletics, where she "refer[ed] to Lia Thomas & every other male who has invaded women's sports as 'he.'"[22]

---

[18] See, e.g., XX-XY Athletics, supra n.5.

[19] See, e.g., XX-XY Athletics (@xx_xyathletics) X (Apr. 19, 2025), https://x.com/xx_xyathletics/status/1913802172329865669.

[20] XX-XY Athletics, Stephanie Turner Takes A Knee Against Male, YOUTUBE (Apr. 13, 2024), https://www.youtube.com/watch?v=9Mu2_9-t4Dw.

[21] XX-XY Athletics, supra n.4.

[22] Jennifer Sey (@JenniferSey) X (April 2, 2025), https://x.com/JenniferSey/status/1907596409433698772.

89.     When speaking on behalf of XX-XY Athletics, Sey regularly refers to swimmer "Lia" Thomas as William Thomas, and she uses exclusively masculine terminology to refer to him.

90.     On May 6, 2025, Sey was interviewed live on Fox News while representing XX-XY Athletics. During the interview, Sey referred to a high-school track athlete in Oregon as "a boy," even though she knew he identified as a girl.

91.     The XX-XY Athletics website layout also reflects the company's belief in the sex binary. Instead of separating its clothing lines merely with the labels "Men's" and "Women's," its links to its gender-specific lines are titled "Men's | XY" and "Women's | XX."

92.     XX-XY Athletics interacts with customers and members of the public via its website and social-media channels, all of which are managed from its offices in Colorado.

93.     It also interacts with customers and members of the public at pop-up stores and other events in Colorado.

94.     In responding to a customer or a member of the public, XX-XY Athletics would not knowingly use pronouns, honorifics, or similar language that was inconsistent with the individual's biological sex.

95.     So, for example, it would not use the honorific "Ms." with a person it understood to be male.

96.     Nor would it use a person's preferred name if it understood that name to be chosen to signal the person's rejection of the person's biological sex.

97.    XX-XY Athletics has published its stance on these issues in a variety of forums, including the succinct tweet: "Suffice to say, we don't do pronouns at @xx_xyahtletics."[23]

98.    At Sey's speaking events and pop-up stores, she and other employees frequently answer customers' and potential customers' questions about the brand and prominent examples of men competing in women's sports. In these discussions, Sey and other XX-XY Athletics employees use given names and biologically accurate pronouns.

99.    XX-XY Athletics frequently receives messages from members of the public rebuking the company for its views on sex and gender. These messages are often filled with hateful and sometimes violent rhetoric, and they are plainly criticizing the company for its views, which include using given names, biologically accurate pronouns, and biologically accurate language.

100.    Members of the public also frequently criticize Sey at her public speaking events for her views on sex and gender. These messages are also often filled with hateful and sometimes violent rhetoric, and they are plainly criticizing Ms. Sey for her views, which include using given names, biologically accurate pronouns, and biologically accurate language.

101.    In response to recent changes to Colorado law, XX-XY Athletics recently published a statement reaffirming its policy on names, pronouns, honorifics, and similar language used to identify a person's sex.

102.    The statement, attached as <u>Exhibit A</u> to this Verified Complaint (the "Statement"), makes it clear that regardless of Colorado law, while XX-XY Athletics

---

[23] XX-XY Athletics (@xx_xyathletics) X (Apr. 19, 2025),
https://x.com/xx_xyathletics/status/1838320652278993021.

will gladly sell its products to anyone, the company will not knowingly use names, pronouns, honorifics, or other language inconsistent with a person's biological sex, regardless of whether that person is a customer, prospective customer, or simply a member of the public. The Statement further notes that any requests by customers, prospective customers, or anyone else to use names, pronouns, honorifics, or other language inconsistent with the person's biological sex will be respectfully declined.

103.    To ensure customers, prospective customers, and the general public understand its message and position, XX-XY Athletics has posted the Statement on its X account.

**Colorado law prohibits XX-XY Athletics from referring to certain athletes with given names and biologically accurate terminology.**

104.    CADA bans discrimination in places of public accommodation that occurs "because of" disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry.

105.    CADA's Public Accommodations Clauses define several unlawful discriminatory practices by places of public accommodation.

106.    For example, under the Denial Clause, it is an unlawful discriminatory practice under CADA for anyone "directly or indirectly, to refuse, withhold from, or deny to an individual or a group … the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation … because of … gender expression." Colo. Rev. Stat. § 24-34-601(2)(a).

107.    Under the Publication Clause, it is an unlawful discriminatory practice under CADA for anyone "directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or

advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual … because of … gender expression." *Id.*

108.    And the Unwelcome Clause makes it an unlawful discriminatory practice under CADA for anyone to circulate the same communications that indicate "that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of … gender expression." *Id.*

109.    As to the Public Accommodations Clauses, a "place of public accommodation" refers to "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public, including but not limited to any business offering wholesale or retail sales to the public." *Id.* § 24-34-601(1).

110.    As a Colorado place of business engaged in sales to the public, XX-XY Athletics is a "place of public accommodation" subject to CADA. *Id.* §§ 24-34-601(1), (2)(a).

111.    Colorado considers online entities to be "place[s] of public accommodation" subject to the Denial and Unwelcome Clauses if they offer goods or services to the public. For example, Colorado stipulated that 303 Creative LLC, an online business, was a "place of public accommodation" subject to CADA. App. to Pet. for Writ of Certiorari 189a, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).

112.    CADA's Advertisement Clauses also prohibit public accommodations from publishing certain statements that it deems discriminatory.

113.    For example, the Discriminatory Advertisement Clause makes it unlawful for any owner, employee, or agent of a place of public accommodation to "directly or indirectly, publish, issue, circulate, send, distribute, give away, or display in any way, manner, or shape or by any means or method … any communication, paper, poster, folder, manuscript, book, pamphlet, writing, print, letter, notice, or advertisement of any kind, nature, or description that … [i]s intended or calculated to discriminate or actually discriminates against any person or class of persons on account of … gender expression … in the matter of furnishing or neglecting or refusing to furnish … any … accommodation, right, privilege, advantage, or convenience offered to or enjoyed by the general public." Colo. Rev. Stat. §§ 24-34-701 (1)(a).

114.    The Denial Advertisement Clause makes it unlawful for any owner, employee, or agent of a place of public accommodation to "directly or indirectly" "publish" any such communication that "[s]tates that any of the accommodations, rights, privileges, advantages, or conveniences of the place shall or will be refused, withheld from, or denied to any person or class of persons on account of" gender expression. *Id*. §§ 24-34-701(1)(b).

115.    And the Unwelcome Advertisement Clause makes it unlawful for any owner, employee, or agent of a place of public accommodation to "directly or indirectly" "publish" any such communication that States that "the patronage, custom, presence, frequenting, dwelling, staying, or lodging at the place by any person or class of persons belonging to or purporting to be of any particular … gender expression … is unwelcome or objectionable or not acceptable, desired, or solicited." *Id*. §§ 24-34-701(1)(c).

116.    As to the Advertisement Clauses, a "place of public accommodation" "has the same meaning as set forth in Title III of the federal 'Americans with Disabilities Act of 1990', 42 U.S.C. sec. 12181(7), and its related amendments and implementing regulations." *Id*. § 24-34-301(16).

117.    XX-XY Athletics is at least arguably a place of public accommodation under the Americans with Disabilities Act because it is a "clothing store" that "affect[s] commerce" by selling apparel to the public. 42 U.S.C.A. § 12181(7)(e).

118.    There is a circuit split over whether a place of public accommodation under the ADA must have a nexus to a physical location, with some courts requiring such a nexus and some holding that no such nexus is necessary. *Compare, e.g.*, *Carparts Dist. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 20 (1st Cir. 1994) (declining to "limit the application of Title III to physical structures which persons must enter to obtain goods and services") *with Stoutenborough v. Nat'l Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995) (holding that the ADA does not apply to television broadcasts because such broadcasts are not a "place"). With respect to online retailers, some lower courts have specifically held that they qualify as places of public accommodation under the ADA. *See, e.g.*, *Mejico v. Alba Web Designs, LLC*, 515 F. Supp. 3d 424, 433-34 (W.D. Va. 2021) (applying ADA to website that sold return labels); *Nat'l Fed. of the Blind v. Scribd, Inc.*, 97 F. Supp. 3d 565, 575–76 (D. Vt. 2015) (applying ADA to digital library service). The Tenth Circuit has not decided this question.

119.    In light of the longstanding principle that courts should "liberally construe[]" CADA "in favor of the legal remedies it provides," Colorado courts would likely agree with courts that have not required any nexus with a physical location to

qualify as public accommodations. *Colo. Civ. Rights Comm'n v. ConAgra Flour Mill Co.*, 736 P.2d 842, 846 (Colo. App. 1987).

120.    Regardless, XX-XY Athletics has a nexus to physical locations because it regularly conducts pop-up events in Colorado at venues that are open to the public and qualify as places of public accommodation in their own right.

121.    It also sells products in (physical) places of public accommodation.

122.    XX-XY Athletics is accordingly subject to the Advertisement Clauses.

123.    On May 16, 2025, Governor Jared Polis signed the Act into law.

124.    The Act amends CADA's definition for "gender expression," which it treats as a protected class, to encompass the use of a "chosen name" and how an individual "chooses to be addressed."

125.    The Act defines "gender expression" under CADA to mean "an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, behavior, chosen name, and how the individual chooses to be addressed." Colo. Rev. Stat. § 24-34-301(9).

126.    The Act defines "chosen name" under CADA to mean "a name that an individual requests to be known as in connection to the individual's disability, race, creed, color, religion, sex, sexual orientation, gender identity, gender expression, marital status, familial status, national origin, or ancestry, so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." *Id.* § 24-34-301(3.5).

127.    The Act states, "[t]he general assembly finds and declares that each Coloradan has the right to access … public accommodations, and advertising that is free from discrimination regardless of their membership in a protected class." *Id.* § 24-34-300.7(1).

128.    Neither the Act nor CADA defines the terms "unwelcome," "objectionable," "unacceptable," or "undesirable," nor do they explain what statements "indicate[]" that someone would be unwelcome, objectionable, unacceptable, or undesirable "because of" their gender expression—terms that appear in the Unwelcome Clause and Unwelcome Advertisement Clause. *Id*. §§ 24-34-601(2)(a), 701(1), 701(1)(a).

129.    Neither the Act nor CADA defines what it means to "indirectly" circulate the communications CADA regulates or to "indirectly" refuse or deny services—terms that appear in all of the Public Accommodations Clauses and Advertisement Clauses. *Id*. §§ 24-34-601(2)(a), 701(1)(a)–(c).

130.    And neither the Act nor CADA defines the phrase "how the individual chooses to be addressed" in relation to gender-expression discrimination. *Id*. § 24-34-301(9).

131.    This vague language grants Defendants unbridled discretion to enforce CADA against businesses like XX-XY Athletics based on their viewpoint, and it prevents businesses like XX-XY Athletics from knowing whether their speech violates the law.

132.    More specifically, this vague language, coupled with the Act's legislative pronouncements and amendments, creates the substantial and imminent risk that Defendants will enforce CADA against XX-XY Athletics based on its policy and practice of referring to transgender individuals, including customers and prospective customers, by their given name.

133.    And it creates the substantial risk that Defendants will enforce CADA against the company based on its policy and practice of referring to transgender

individuals exclusively with pronouns and terminology that match their biological sex.

134.    CADA thus prohibits speech that is core to XX-XY Athletics' mission and purpose, and it compels speech that violates the company's beliefs.

135.    As explained above, under these policies, it is common practice for XX-XY Athletics to publish, post, and circulate communications and advertisements referring to transgender individuals by their given name on social media, in public appearances, and elsewhere. *See* Colo. Rev. Stat. § 24-34-601(2)(a); *see also supra* ¶¶ 67–103.

136.    And it is common practice for XX-XY Athletics to publish, post, and circulate communications and advertisements referring to transgender individuals using pronouns and terminology that match their biological sex, making these communications inconsistent with "how the individual chooses to be addressed." Colo. Rev. Stat. § 24-34-301(9); *see also supra* ¶¶ 67–103.

137.    XX-XY Athletics happily sells its products to anyone, regardless of any protected characteristics, including gender expression.

138.    But XX-XY Athletics will not knowingly refer to anyone—customer, prospective customer, athlete, public figure, or member of the public—using a "chosen name," pronouns, honorifics, or other language contrary to the person's biological sex.

139.    And XX-XY Athletics published the Statement to make its policy clear to the world.

140.    In Colorado's view, by refusing to refer to individuals by their "chosen name," and by using biologically accurate pronouns and terminology, XX-XY

Athletics refers to these individuals in a manner inconsistent with their "gender expression," as defined by the Act. Colo. Rev. Stat. § 24-34-301(9).

141.    In Colorado's view, XX-XY Athletics unlawfully deprives Coloradans of "advertising" free from discrimination based on "gender expression" by publishing advertisements that use transgender-identifying individuals' given names and biological pronouns and other references

142.    In Colorado's view, XX-XY Athletics' communications and desired communications referring to transgender individuals in a way inconsistent with their gender expression indicate "that the full and equal enjoyment of the … privileges, advantages, or accommodations" at XX-XY Athletics will be refused to them based on their "gender expression," thus violating the Publication Clause. *Id* § 24-34-601(2)(a).

143.    Thus, the Act compels XX-XY Athletics to refrain from using the language it would like to use—such as given names, biologically accurate pronouns, and other biologically accurate language—and to use language it does not want to use—such as preferred names, biologically inaccurate pronouns, and other biologically inaccurate language—in its communications—or violate the Publication Clause. *Id.*

144.    In Colorado's view, these communications violate the Unwelcome Clause by indicating to transgender individuals that their "patronage or presence" at XX-XY Athletics "is unwelcome, objectionable, unacceptable, or undesirable because of" their "gender expression." *Id.*

145.    Thus, the Act compels XX-XY Athletics to refrain from using language—such as given names, pronouns, honorifics, and similar language

consistent with an individual's biology—and to use language inconsistent with an individual's biological sex—or violate the Unwelcome Clause. *Id.*

146.    In Colorado's view, these communications also constitute a direct or indirect refusal or denial of the "full and equal enjoyment of the … privileges, advantages, or accommodations" to transgender individuals at XX-XY Athletics because of their "gender expression," thus violating the Denial Clause. *Id.*

147.    Thus, Colorado law compels XX-XY Athletics to refrain from using certain language—such as biologically accurate pronouns and given names—and to use other language—such as biologically inaccurate pronouns and preferred names—or violate the Denial Clause. *Id.*

148.    In Colorado's view, they also constitute communications or advertisements that are "intended or calculated to discriminate or actually discriminate[]" against a person on account of gender expression, thus violating the Discriminatory Advertisement Clause. *Id.* § 24-34-701(1)(a).

149.    Thus, Colorado law compels XX-XY Athletics to use certain language in its advertisements—such as such as given names, biologically accurate pronouns, and other biologically accurate language—and to use language it does not want to use—such as preferred names, biologically inaccurate pronouns, and other biologically inaccurate language—in its communications—or violate the Discriminatory Advertising Clause. *Id.*

150.    In Colorado's view, they constitute communications or advertisements to the effect that certain rights, privileges, or conveniences of XX-XY Athletics (such as the use of a person's preferred name) will be refused to a "class of persons" on account of gender expression, thus violating the Denial Advertisement Clause. *Id.* § 24-34-701(1)(b).

151.    Thus, Colorado law compels XX-XY Athletics in its advertisements to use language suggesting that it will use preferred names and biologically accurate language and to refrain from using language suggesting that it will not—or violate the Denial Advertisement Clause. *Id.*

152.    And in Colorado's view, they constitute communications or advertisements "directly or indirectly" stating that an individual's patronage at XX-XY Athletics is "unwelcome or objectionable or not acceptable, desired, or solicited" because of gender expression, thus violating the Unwelcome Advertisement Clause. *Id.* § 24-34-701(1)(c).

153.    Thus, the Act compels XX-XY Athletics in its advertisements to refrain from using certain language—such as given names and biologically accurate pronouns and similar language—and to use other language instated—such as chosen names and biologically inaccurate pronouns and similar language—or violate the Unwelcome Advertisement Clause. *Id.*

154.    The Act also compels XX-XY Athletics to speak in a manner contrary to its beliefs or alternatively to stay silent—both of which XX-XY Athletics is unwilling to do.

155.    To speak about transgender-identifying male athletes consistent with CADA, XX-XY Athletics must reverse its policy of referring to individuals by their given names when known and always refer to transgender individuals by their preferred names.

156.    Because there is a substantial and imminent risk Defendants will enforce CADA to require XX-XY Athletics to refer to transgender-identifying male athletes by their "chosen name," the law unlawfully compels the company to refer to transgender athletes like Zachary Rose as "Liaa," Hugo Caldas as "Ana," and

Redmond Sullivan as "Annika," or remain silent, even though doing so violates XX-XY Athletics' desired message informed by its principles and mission. *See supra* ¶¶ 67–103.

157.   And because there is a substantial and imminent risk Defendants will enforce CADA to require XX-XY Athletics to refer to a transgender athlete "how the individual chooses to be addressed," Colo. Rev. Stat. § 24-34-301(9), the law unlawfully compels the company to refer to transgender athletes like James "Hailey" Davidson, Natalie Ryan, and AB Hernandez with pronouns and terminology inconsistent with their biological sex, or stay silent, even though it violates XX-XY Athletics' principles to do so. *See supra* ¶¶ 67–103.

158.   The Act creates a particularly serious risk that Defendants will enforce CADA to prohibit and compel speech in these manners. The Act's amendment to CADA's definition of "gender expression" to include "chosen name[] and how the individual chooses to be addressed" indicates that referring to a person otherwise— that is, "deadnaming" or "misgendering"—is an unlawful discriminatory practice.

159.   Thus, the Act's definitions of chosen name and gender expression create a serious likelihood that Defendants will enforce CADA against XX-XY Athletics for the company's policy and practice of referring to transgender-identifying individuals by their given name and exclusively with pronouns and terminology that match their biological sex.

***CADA uses aggressive enforcement mechanisms and penalties that burden XX-XY Athletics' ability to speak and operate.***

160.   Any person "claiming to be aggrieved by a discriminatory or an unfair practice" may file a charge of discrimination with the Commission. Colo. Rev. Stat. § 24-34-306(1)(a)(I). The Attorney General and the Commission may also on their own

file a charge of discrimination if they believe a discriminatory practice "imposes a significant societal or community impact." *Id.* § 24-34-306 (1)(b).

161.    What's more, a person alleging violations of the Public Accommodations Clauses doesn't have to go through the Commission at all. Instead, that person may file suit directly in a Colorado district court for violations of the provisions. *See id.* § 24-34-306(14).

162.    Colorado regulations define "discriminatory or unfair practice" to include "practices" and "omissions" prohibited by CADA. 3 Colo. Code Regs. § 708-1:10.2(K). So simply having what Colorado considers a discriminatory policy is sufficient to trigger an enforcement action. *See id.*

163.    The definition of "person" includes "the State of Colorado and all of its political subdivisions and agencies," Colo. Rev. Stat. § 24-34-301(15)(a), so any city, county, or state agency may file a complaint.

164.    Colorado regulations provide that "[t]he basis of belief for initiating a charge is information from any source sufficient to suggest that a discriminatory or unfair practice has been or is being committed." 3 Colo. Code Regs. § 708–1:10.11(C). So simply reading about XX-XY Athletics on the internet would be sufficient to commence an enforcement action.

165.    Once a charge is filed, a burdensome investigatory and administrative process begins in which the Director has broad authority to "subpoena witnesses and compel the testimony of witnesses and the production of books, papers, and records." Colo. Rev. Stat. § 24-34-306(2)(a).

166.    If the Director determines that probable cause exists for crediting a charge's allegations, she "shall order the charging party and the respondent to participate in compulsory mediation" and "shall endeavor to eliminate the

discriminatory or unfair practice by conference, conciliation, and persuasion and by means of the compulsory mediation." *Id.* § 24-34-306(2)(b)(II).

167.    If the Director believes that mediation, conference, conciliation, and persuasion have failed to ameliorate the allegedly discriminatory practice, she then "shall" report the charge to the Commission. Colo. Rev. Stat. § 24-34-306(4).

168.    Upon receipt of such report, the Commission may file a notice and complaint requiring the respondent to answer the charge at a formal hearing before the Commission or an administrative law judge. *Id.*

169.    For such a hearing, the parties are entitled to full discovery under the Colorado Rules of Civil Procedure. *Id.* § 24-34-306(5).

170.    At the conclusion of any requested discovery, the parties proceed to a hearing before the Commission or administrative law judge in which each party hast the opportunity to submit evidence and take testimony. *Id.* § 24-34-306(8); *see id.* § 24-4-105(4)(a).

171.    If the Commission or administrative law judge determines at the conclusion of the hearing that the respondent engaged in a discriminatory practice, the Commission may issue a cease-and-desist order to the respondent or issue an order demanding that the respondent "take such action" as it deems fit. *Id.* § 24-34-306(9).

172.    Any time before receiving a notice from the Director, a charging party may request from the Director a right-to-sue letter, which the Director shall grant if she believes that she will not complete her investigation of the charge within 180 days of its filing. *Id.* § 24-34-306(15). If the charging party receives such a letter, it may bring an action in a Colorado district court based on the allegations in the charge. *See id.*

33

173.    A party can also appeal a final order from the Commission to the
Colorado Court of Appeals. *Id.* § 24-34-307(1).

174.    If a court finds that a place of public accommodation violated the
Public Accommodations Clauses, it may fine the party $3,500 for *each* violation. *Id.*
§ 24-34-602.

175.    The Colorado Court of Appeals has also held that damages,
injunctions, and other remedies are also available for violations of the CADA
provisions related to public accommodations. *See Arnold v. Anton Co-op. Ass'n*, 293
P.3d 99, 104 (Colo. App. 2011).

176.    And if a court finds that a place of public accommodation violated the
Advertisement Clauses, it may find the party guilty of a class two misdemeanor.
Colo. Rev. Stat. § 24-34-705.

177.    Penalties for a class two misdemeanor include "120 days
imprisonment, not more than a seven hundred fifty dollar fine, or both." *Id.* § 18-
1.3-501.

178.    In addition to the penalties available for violations of CADA, the
prospect of undergoing the lengthy, broad, and intrusive investigatory process
outlined in CADA burdens XX-XY Athletics' speech.

179.    Once an investigation begins, the Director has broad authority to
initiate and maintain proceedings that would force XX-XY Athletics—a business
with only an owner and a few employees—to expend substantial time, money, and
other resources responding to subpoenas, document requests, interrogatories, and
sitting for interviews, as well as hiring and paying legal counsel to protect its
interests.

180.    At the conclusion of an investigation, CADA permits the Director to drag XX-XY Athletics into an expensive and time-consuming mediation process, and to go through a live hearing with full discovery if the Commission reaches a conclusion adverse to the company, all of which would require the company to expend more resources.

181.    And the law allows a complainant to bring a civil action in certain circumstances with all of the time and expenses that motion practice, discovery, trial, and appeals entail.

182.    At the end of all of these processes, XX-XY Athletics is subject to significant civil and criminal penalties or damages if an adverse decision is reached.

183.    XX-XY Athletics intends to continue to abide by its policies and refer to athletes, customers, prospective customers, public figures, and members of the public by their given names and with pronouns and terminology that match their biological sex. In doing so, XX-XY Athletics faces the imminent risk of an enforcement proceeding, prosecution, or civil lawsuit under CADA and the severe penalties for noncompliance.

184.    Colorado has aggressively enforced and defended CADA in ways that violated the First Amendment regarding topics related to sexual orientation and gender expression.

185.    For example, Colorado has enforced CADA against the bakery Masterpiece Cakeshop for its refusal on religious grounds to create a custom wedding cake celebrating a gay wedding. The Supreme Court held that Colorado's prosecution violated the bakery owner's religious freedom under the First Amendment. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 640 (2018).

186.    Undeterred, Colorado again prosecuted Masterpiece Cakeshop for its refusal on religious grounds to create a custom wedding cake celebrating a person's "gender transition." *Masterpiece Cakeshop, Inc. v. Scardina*, 556 P.3d 1238, 1242 (Colo. 2024).

187.    Colorado also defended CADA's application against 303 Creative LLC, a graphic design business whose owner refused to create custom wedding websites celebrating a view of marriage contrary to her religious beliefs. The Supreme Court held that Colorado's application of CADA violated the business owner's right to free speech under the First Amendment. *303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023).

188.    And the Colorado Civil Rights Commission has promulgated regulations stating that "deliberately misusing an individual's preferred name, form of address, or gender-related pronoun" amounts to "[u]nlawful harassment . . . on the basis of sexual orientation." 3 Colo. Code Regs. § 81.6(a)(4).

189.    In short, XX-XY Athletics has engaged and will continue to engage in speech protected by the First Amendment using given names, biologically accurate pronouns, and similar language. That speech is at least arguably proscribed by CADA, particularly as the new chosen name and gender expression definitions operate through the Public Accommodations Clauses and Advertisement Clauses. And Colorado's aggressive enforcement history paired with the ability of anyone to start the enforcement process based solely on what they read online makes the threat of enforcement credible, substantial, and imminent. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–65 (2014).

**CADA defeats XX-XY Athletics' ability to express its core message.**

190. By prohibiting XX-XY Athletics from referring to all individuals by their given name and biologically accurate pronouns and terminology, CADA defeats the company's ability to express the core message of its brand—that male athletes' inclusion in women's sports is unjust and dangerous.

191. The most common way that XX-XY Athletics demonstrates why male competition in women's sports is unfair or unsafe is by reference to specific transgender-identifying male athletes. As explained, XX-XY Athletics frequently draws attention to specific transgender-identifying male athletes. *See supra* ¶¶ 67–103. There is a substantial and imminent risk, however, that all of these references violate CADA and will be the basis for an enforcement action.

192. For example, on April 18, 2025, XX-XY Athletics posted the following text on Facebook: "A boy just won the Therapeutic Associates Chehalem Classic today in Oregon. Apparently beat out 20 girls. Zachary 'Liaa' Rose of Ida B. Wells High."[24] This post was shared extensively, appearing on Instagram and X as well.

193. Because XX-XY Athletics employed masculine terminology to refer to Rose, which was inconsistent with how Rose desired to be addressed, and because the company referred to Rose as "Zachary," even though it knew that was not his preferred name, there is a substantial risk that the post violates CADA as gender-expression discrimination and will be the basis for an enforcement action.

194. To correct the language noncompliant with CADA, XX-XY Athletics would need to edit the post as follows: "A girl just won the Therapeutic Associates

---

[24] *See* XX-XY Athletics, *supra* n.10.

Chehalem Classic today in Oregon. Apparently beat out 20 girls. Liaa Rose of Ida B.
Wells High."

195.    By using female terminology and a preferred name to refer to Rose, the
post entirely loses its original meaning. The original post drew attention to the
injustice of a boy winning a girls' athletics competition. But the version of the post
compliant with CADA renders this meaning wholly unidentifiable.

196.    XX-XY Athletics' past experience with censorship further demonstrates
how CADA's censorship restricts the company's ability to express its message.

197.    In March 2024, XX-XY Athletics shared a video advertisement on
TikTok. The video depicted a transgender-identifying male athlete spiking a
volleyball in a high school match; the ball hit high school girl Peyton McNabb in the
face.[25] The boy spiked the ball with such force that it caused McNabb serious
neurological damage and partial paralysis.

198.    Over this depiction, the voiceover stated, "stand up if you know that it
isn't fair or safe to allow males to compete in girls' sports."

199.    TikTok removed the ad for "hate speech" and permanently banned XX-
XY Athletics from advertising on the platform. TikTok told XX-XY Athletics that
the post constituted hate speech because it referred to the transgender-identifying
male in the volleyball clip as male.

200.    XX-XY Athletics asked TikTok how it could correct the video to comply
with TikTok's policies, to which TikTok replied that the company must refer to the
transgender-identifying boy as a girl.

---

[25] XX-XY Athletics, *Watch Our Launch Ad, "Stand Up"*, YOUTUBE (Mar. 16, 2024),
https://www.youtube.com/watch?v=0HYRsFNbm3o.

201.    Edited accordingly, the voiceover would state, "stand up if you know that it isn't fair or safe to allow girls to compete in girls' sports."

202.    Like the Facebook post about Zachary Rose, the edited version of the TikTok ad renders its original message—encouraging people to stand up to boys in girls' sports—unintelligible. And like the Facebook post, because the TikTok ad refers to the transgender-identifying male athlete as "male," XX-XY Athletics would need to edit it to comply with CADA.

203.    As these messages demonstrate, referring to transgender-identifying male athletes by their given names and biologically accurate pronouns is essential to express the message that males should not be allowed to compete in women's sports.

204.    Sey created XX-XY Athletics to spread this message, and the company continues to exist for that purpose. By prohibiting the company from using given names and biologically accurate pronouns when referring to transgender individuals, CADA stifles XX-XY Athletics' ability to share its core message and achieve its purpose.

205.    Forcing XX-XY Athletics to use biologically inaccurate language with customers or others—even in ostensibly private transactions—would contradict the company's core beliefs and message and thus undermine its advocacy. This is all the more true if it were forced to use biologically inaccurate language on publicly available media like its website or social media channels.

***CADA disproportionately burdens XX-XY Athletics compared to businesses expressing different views.***

206.    Although CADA prohibits XX-XY Athletics from speaking consistently with its view that sex is immutable, the law allows other businesses that also

39

qualify as public accommodations to speak according to their view that sex can be changed.

207.    This distinction in treatment is based on a particular view that the business holds about human sexuality and gender identity.

208.    Many businesses that operate in Colorado promote the view that sex can be changed and encourage participation by transgender athletes in the sports sex category of their choosing.

209.    For example, Puma, a direct competitor with XX-XY Athletics, entered an ongoing partnership with the Trevor Project in 2020 called "Reform the Locker Room."[26] The program affirms the belief that sex can be changed and encourages schools to include transgender athletes in the sports sex category with which they identify.[27]

210.    Additionally, Adidas and Under Armor, also direct competitors with XX-XY Athletics, provide funding to Athlete Ally. Athlete Ally promotes the idea that sex can be changed and promotes policies to athletic-governing bodies worldwide that would allow transgender-identifying men to compete in women's sports.[28]

---

[26] *Reform*, PUMA (last visited May 12, 2025), https://us.puma.com/us/en/reform?srsltid=AfmBOoqaO9cYjAu7AOatsYJzKCO0N3P tSanj789sg23T5sLCuK8Xn3bK.

[27] *Id.*

[28] Pat Benson, *Adidas & Athlete Ally Aim to Make Sports More Inclusive*, SPORTS ILLUSTRATED (Jun. 8, 2024), https://www.si.com/fannation/sneakers/interviews/adidas-athlete-ally-aim-to-make-sports-more-inclusive; *Unified With Pride*, UNDER ARMOUR (last visited May 12, 2025), https://about.underarmour.com/en-us/stories/2019/06/unified-with-pride.html.

211. Nike, a direct competitor with XX-XY Athletics, also entered a paid partnership with Dylan Mulvaney, a transgender-identifying man. Mulvaney released a series of videos promoting a line of Nike women's athletic apparel on behalf of Nike in 2023.[29]

212. XX-XY Athletics is in direct competition with these athletic apparel companies and competes in the same general market for customers seeking athletic apparel.

213. But CADA imposes increased speech burdens and restrictions on XX-XY Athletics that it does not on these other businesses.

214. While CADA prohibits XX-XY Athletics' core brand messaging, Puma's, Adidas's, Under Armour's, and Nike's messaging are completely unaffected by the law. These companies may continue to spread a message that affirms the idea that sex can be changed and encourages participation by transgender-identifying men in women's sports; XX-XY Athletics, on the other hand, must entirely transform its messaging in a way that significantly diminishes its persuasive impact to comply with CADA.

## VI.    ALLEGATIONS OF LAW

215. XX-XY Athletics is subject to and must comply with CADA.

216. XX-XY Athletics publishes, posts, republishes, and circulates communications and advertisements regulated by CADA, including the Statement.

217. CADA violates XX-XY Athletics' constitutional rights and places it at substantial and imminent risk of enforcement and punishment simply for exercising its constitutional rights.

---

[29] Dylan Mulvaney (@dylanmulvaney) INSTAGRAM (Apr. 5, 2023), https://www.instagram.com/p/CqqO3Dnu4TQ/?img_index=1.

218.    As a direct and proximate result of Defendants' violations of XX-XY Athletics' constitutional rights, XX-XY Athletics has suffered and will suffer ongoing irreparable harm, entitling the company to declaratory and injunctive relief.

219.    XX-XY Athletics does not have an adequate monetary or legal remedy for the loss of its constitutional rights.

220.    Unless Defendants are enjoined from enforcing CADA, XX-XY Athletics will continue to suffer irreparable harm.

## VII.    CAUSES OF ACTION

### First Cause of Action: Violation of First Amendment's Free Speech, Press, and Assembly Clauses

221.    XX-XY Athletics repeats and realleges each allegation contained in paragraphs 1 through 220 of this complaint.

222.    The First Amendment's Free Speech, Press, and Assembly Clauses protect XX-XY Athletics' ability to speak, create, publish, sell, and distribute speech; to associate with others and with their messages for expressive purposes; to adopt and act on certain speech-related policies; to decline to associate with others and their message for expressive purposes; to decline to create, publish, sell, and distribute speech; to be free from content-based and viewpoint-based discrimination; and to be free from overbroad and vague restrictions on speech that give enforcement officials unbridled discretion.

223.    XX-XY Athletics' speech activities, including its conversations with customers and prospective customers, advertisements, social media posts, website content, and public addresses, are forms of protected speech and expressive association.

224.    As applied to XX-XY Athletics, CADA impermissibly compels the company to speak messages with which it disagrees—or stay silent—by requiring it to refer to individuals by their preferred name, pronouns, and other terminology.

225.    As applied to XX-XY Athletics, CADA impermissibly discriminates against the company's speech based on content and viewpoint by prohibiting it from referring to individuals by their given name and with pronouns and terminology consistent with their biological sex.

226.    As applied to XX-XY Athletics, CADA impermissibly inhibits the company's ability to form expressive associations it desires to form and to avoid expressive associations it desires to avoid by requiring the company to refer to individuals by their preferred name, pronouns, and other terminology and prohibiting the company from referring to individuals by their given name and with pronouns and terminology consistent with their biological sex.

227.    As applied to XX-XY Athletics, CADA is vague and allows Defendants unbridled discretion to evaluate the company's speech and then discriminate against it based on content and viewpoint in determining whether to apply CADA.

228.    The Unwelcome Clause is facially overbroad because it prohibits public accommodations from "directly or indirectly" publishing, circulating, issuing, displaying, posting, or mailing "any written, electronic, or printed communication, notice, or advertisement that indicates . . . that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of" gender expression.

229.    The Unwelcome Advertisement Clause is facially overbroad because it prohibits public accommodations from "directly or indirectly" publishing, issuing, circulating, sending, distributing, giving away, or displaying "in any way, manner,

or shape or by any means or method . . . any communication, paper, poster, folder, manuscript, book, pamphlet, writing, print, letter, notice, or advertisement of any kind, nature, or description that . . . [s]tates that the patronage, custom, presence, frequenting, dwelling, staying, or lodging at the place by any person or class of persons belonging to or purporting to be of any . . . gender expression . . . is unwelcome or objectionable or not acceptable, desired, or solicited."

230. And CADA's definition of gender expression—as it is incorporated into the Public Accommodation Clauses and Advertisement Clauses—is facially overbroad because it prohibits speech based on "how [an] individual chooses to be addressed."

231. Likewise, CADA's definition of "chosen name"—as it is incorporated into the Public Accommodation Clauses and Advertisement Clauses—is facially overbroad because it requires using an individual's chosen name unless offensive or frivolous.

232. The Unwelcome Clause, Unwelcome Advertisement Clause, definition of gender expression, and definition of chosen name (as those definitions apply through the Public Accommodation Clauses and Advertisement Clauses) are facially overbroad because they prohibit a wide swath of constitutionally protected speech— such as speech advocating for women's sports to be limited to female athletes, protesting the inclusion of male athletes in women's sports, and referring to transgender-identifying men using their given names, male pronouns and honorifics, and similar language to promote the message that sex is biological, binary, and immutable.

233. These clauses prohibit far more speech than is necessary to accomplish any legitimate government objective and reach protected statements that oppose or

criticize someone's ideas, beliefs, actions, or speech, or that exclusively favor someone's ideas, beliefs, actions, or speech, or that use given names or biological pronouns or declines to use chosen names or inaccurate pronouns to convey a constitutionally protected message.

234.    Accordingly, as applied to XX-XY Athletics, CADA violates the First Amendment's protection for free speech, free association, assembly, and press.

235.    And the Unwelcome Clause, Unwelcome Advertisement Clause, gender expression definition, and chosen name definition (as those definitions apply through the Public Accommodation Clauses and Advertisement Clauses) facially violate the First Amendment's protection for free speech, free association, assembly, and press.

## Second Cause of Action: Vagueness Under Fourteenth Amendment's Due Process Clause

236.    XX-XY Athletics repeats and realleges each allegation contained in paragraphs 1 through 220 of this complaint.

237.    The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violates CADA.

238.    The Unwelcome Clause prohibits any place of public accommodation from "directly or indirectly" publishing, circulating, issuing, displaying, posting, or mailing any communication, notice, or advertisement that "indicates" that an individual's patronage or presence is "unwelcome, unacceptable, or undesirable" because of gender expression.

239.    XX-XY Athletics, Defendants, and third parties of ordinary intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, made through mail, or made directly to the public "indicates" "directly or indirectly" that an individual's patronage or presence is "unwelcome, unacceptable, or undesirable" because of gender expression.

240.    These terms are also overbroad because they prohibit speech that may cause a person to feel unwelcome, unacceptable, or undesirable but is constitutionally protected because the government lacks a sufficient interest in restricting it, and the restriction is not properly tailored.

241.    The Unwelcome Advertisement Clause prohibits any place of public accommodation from "directly or indirectly" publishing, issuing, circulating, sending, distributing, giving away, or displaying any communication that "[s]tates that the patronage, custom, presence, frequenting, dwelling, staying, or lodging at the place by any person or class of persons belonging to" any gender expression "is unwelcome or objectionable or not acceptable, desired, or solicited."

242.    XX-XY Athletics, Defendants, and third parties of ordinary intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, made through mail, or made directly to the public states "directly or indirectly" that a person's patronage or presence is "unwelcome or objectionable or not acceptable, desired, or solicited" because of gender expression.

243.    These terms are also overbroad and vague because they prohibit speech that may cause a person to feel unwelcome, unacceptable, undesirable, or

unsolicited but is constitutionally protected because the government lacks a compelling interest in restricting it, and the restriction is not narrowly tailored.

244.    CADA's definition of "gender expression"—as it is incorporated into the Public Accommodation Clauses and Advertisement Clauses—is also unconstitutionally vague.

245.    XX-XY Athletics, Defendants, and third parties of reasonable intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, made through mail, or made directly to the public are inconsistent with "how [an] individual chooses to be addressed," and thus, inconsistent with an individual's gender expression.

246.    These terms are also overbroad because they prohibit speech that may be inconsistent with how an individual chooses to be addressed but is constitutionally protected because the government lacks a compelling interest in restricting it, and the restriction is not narrowly tailored.

247.    CADA's definition of "chosen name"—as it is incorporated into the Public Accommodation Clauses and Advertisement Clauses—is also unconstitutionally vague.

248.    The definition requires XX-XY Athletics to use an individual's "chosen name" unless the name "contain[s] offensive language" or the individual is requesting the chosen name "for frivolous purposes."

249.    XX-XY Athletics, Defendants, and third parties of reasonable intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, made through mail, or made directly to the public are required or prohibited under the offensiveness and frivolity exceptions.

250.    XX-XY Athletics, Defendants, and third parties of reasonable intelligence, therefore, cannot know what is prohibited by CADA.

251.    Defendants can use this vagueness, overbreadth, and accompanying unbridled discretion to apply the Unwelcome Clause, the Unwelcome Advertisement Clause, and the gender expression definition in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

252.    Accordingly, facially and as applied to XX-XY Athletics, the Unwelcome Clause, the Unwelcome Advertisement Clause, and the gender expression definition violate the Fourteenth Amendment's Due Process Clause.

## Third Cause of Action: Violation of the Fourteenth Amendment's Equal Protection Clause

253.    XX-XY Athletics repeats and realleges each allegation contained in paragraphs 1 through 220 of this complaint.

254.    The Fourteenth Amendment's "Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 101 (1972).

255.    CADA impermissibly infringes on the fundamental right to speak freely.

256.    CADA affects First Amendment interests by compelling and restricting speech about sex and gender—prohibiting public accommodations from using biologically accurate names, pronouns, honorifics, and similar language and compelling the use of inaccurate names, pronouns, honorifics and similar language.

257.    CADA discriminates based on the content and viewpoint of speech because it prohibits biologically accurate speech affirming that sex is biological and

immutable, while permitting biologically inaccurate speech affirming that sex can be changed. The law is therefore subject to strict scrutiny.

258.    CADA fails to satisfy rational basis or strict scrutiny review because it is not narrowly tailored to any legitimate government objective—indeed, it is both overinclusive and underinclusive—and thus violates the Equal Protection Clause.

259.    CADA also violates the Equal Protection Clause by burdening public accommodations' free-speech rights, permitting and compelling speech espousing certain viewpoints (using biologically inaccurate language) while prohibiting speech espousing other viewpoints (using biologically accurate language), and excluding and punishing speech that the government disfavors while allowing speech the government favors on that same topic.

260.    Accordingly, as applied to XX-XY Athletics, CADA violates the Equal Protection Clause.

WHEREFORE, XX-XY Athletics respectfully prays that the Court grant the equitable and legal relief set forth hereinafter in the Prayer for Relief.

## VIII.  PRAYER FOR RELIEF

XX-XY Athletics respectfully requests that this Court enter judgment against Defendants and provide the following relief:

1.    A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

      a.  Enforcing CADA as applied to XX-XY Athletics' constitutionally protected speech, association, assembly, due-process, free-press, and equal protection rights;

      b.  Enforcing CADA as applied to speakers similarly situated to XX-XY Athletics; and

     c.   Enforcing the Unwelcome Clause and Unwelcome Advertisement Clause facially;

     d.   Enforcing the gender expression and chosen names definitions as they are incorporated into the Public Accommodation Clauses and Advertisement Clauses facially.

2.     A declaration that CADA has violated and continues to violate XX-XY Athletics' constitutional rights to engage in free speech, association, assembly, and press and to equal protection of the laws as applied to XX-XY Athletics' constitutionally protected expression and activities;

3.     A declaration that the Unwelcome Clause, Unwelcome Advertisement Clause, and gender expression definition facially violate the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.     That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations have the force and effect of a final judgment;

5.     That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.     That this Court award XX-XY Athletics' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.     That this Court issue the requested injunctive relief without a condition of bond or other security required of XX-XY Athletics; and

8.     That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 27th day of May, 2025.

*s/ Jonathan A. Scruggs*
Jonathan A. Scruggs (Ariz. Bar No. 030505)
Henry W. Frampton, IV (S.C. Bar No. 75314)
Mercer Martin (Ariz. Bar No. 038138)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
hframpton@ADFlegal.org
mmartin@ADFlegal.org

Katherine C. Yarger (Co. Bar. No. 40387)
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
(512) 693-8350
(512) 727-4755 (facsimile)
katie@lkcfirm.com

Mary Elizabeth Miller (DC Bar No. 252694)*
Shannon G. Denmark(DC Bar No. 1617283)*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
(512) 727-4755 (facsimile)
mary@lkcfirm.com
shannon@lkcfirm.com

Andrew B. Davis (Tex. Bar No. 24082898)*
Joshua P. Morrow (Tex. Bar No. 24106345)*
Alexis Swartz (Tex. Bar. No. 24122045)*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
(512) 727-4755 (facsimile)
andrew@lkcfirm.com
josh@lkcfirm.com
alexis@lkcfirm.com

*Application for Attorney Admission to the U.S. District Court for the District of Colorado Pending*

## DECLARATION UNDER PENALTY OF PERJURY

I, _Jennifer Sey_ a citizen of the United States and a resident of the State of Colorado, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this __27__ day of __May__, 2025, at _____Denver_____, Colorado.

_____