IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-01668-DDD-SBP

COMMITTEE OF FIVE, INC.,

    *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, et al.,

    *Defendants*.

**Brief of Amici Curiae Truth and Liberty Coalition and James Dobson Family Institute in Support of Plaintiffs' Motion for a Preliminary Injunction**

## INTRODUCTION

Under Colorado House Bill 25-1312, business owners, teachers, and healthcare workers that espouse traditional Christian beliefs must use opposite-sex pronouns when addressing customers, students, and patients, even though doing so violates their faith. For many Christians, using such pronouns constitutes bearing false witness. The law forces them to choose between their livelihood and their conscience.

Sadly, this violation of the constitutional rights of Colorado's Christians is wholly unsurprising. HB 25-1312 represents the latest escalation in Colorado's sustained campaign against religious liberty and the rights of Christians. Over the past decade, the Supreme Court of the United States has twice ruled that Colorado has violated the constitutional rights of its religious citizens, finding the state engaged in clear and impermissible hostility toward religion. *See Masterpiece Cakeshop v.*

*Colorado Civil Rights Commission,* 584 U.S. 617 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). The Court is likely to do so a third time soon in *Chiles v. Salazar*, 116 F.4th 1178, 1191 (10th Cir. 2024), *cert. granted*, 145 S. Ct. 1328, 221 L. Ed. 2d 416 (2025).

Amici, Christian organizations that represent thousands of Christians in Colorado and across the country, submit this brief to assist the Court in evaluating the massive implications of HB 25-1312 for the speech of traditional Christians. Because the law is patently unconstitutional, the Court should grant Plaintiffs' motion for preliminary injunction forthwith.

## INTERESTS OF AMICI

**Truth and Liberty Coalition, Inc.** is a Colorado non-profit corporation, based in Woodland Park. The mission of Truth and Liberty Coalition is to educate, unify, and mobilize followers of the Lord Jesus Christ to stand for truth in all areas of cultural influence, including the family, church, business, education, arts and entertainment, media, and government. Truth and Liberty recognizes that modern political and cultural forces have caused many Christians to become uncertain and fearful about how to live for Christ and express their faith publicly. Truth and Liberty works therefore to encourage and equip believers to live consistently with a biblical worldview and Christ's commands by sharing Truth in all aspects of life, both public and private, both in word and action. This requires that Christians be free to speak their truth without interference from the government.

2

The **Dr. James Dobson Family Institute** is a nonprofit corporation that uplifts and defends the biblical and traditional framework of the family, which includes parental rights and the freedom to exercise one's religious beliefs. Inherent within these convictions are the freedom of speech and the right of Christians to speak their convictions. These fundamental rights have been preserved for centuries and must be maintained for the institution of the family to remain intact and flourish.

Amici recognize that the Colorado Anti-Discrimination Act contains a religious exemption that may exclude them from the purview of the provisions at issue in this case. This brief is submitted not because amici fear enforcement against themselves, but because they fear enforcement against their myriad constituents and members who do not work for a religious organization and are subject to the full force of the law. Amici serve the interests and souls of many thousands who will not be able to avail themselves of the religious exemption.

## ARGUMENT

### I. Traditional Christian belief holds that sex and gender are inherent in God's ordering of creation.

The Bible teaches that the bodies of men and women represent God's creational design. God creates men with male bodies and women with female bodies. Gen. 1:27. Amici and their constituents believe that personal feelings or perceptions are not relevant to determining a person's sex, nor are bodies impediments to one's true self. The two sexes are complementary and reflect the image and nature of God and His creational design in human biology. Matt. 19:4–5.

As a result of sin and the fall, people often have perceptions of themselves that are inconsistent with the reality of their God-given identity. Gender dysphoria is one manifestation of such dissonance. It is not a reflection of objective reality about the person's sex. Christians thus believe that while those experiencing gender dysphoria should be treated with respect and dignity befitting all people, respect for the person does not require agreement with their dissonant belief. To the contrary, amici and their constituents are duty bound to affirm not the subjective belief of the person, but the truth according to objective reality and the Word of God. Indeed, the duty to respect the individual (and more importantly, Christ's command to love the individual)[1] cannot be separated from the duty to speak the truth. Scripture instructs us to "speak the truth in love." Eph. 4:15. As the Apostle Paul wrote, "Love does not rejoice in iniquity, but rejoices in the truth." 1 Cor. 13:6. And truth requires that such persons be treated as the gender corresponding to their biological, God-given sex. For Christians, to refer to individuals according to their biological, God-given sex is an act of love motivated by truth, not an attempt to upset or harm—let alone invidious discrimination.

Like so many recent policies enacted by the Colorado legislature, Colorado House Bill 25-1312 declares these age-old Christian beliefs anathema and forces Christians to use language that does not align with a person's biology. Amici and many other Christians believe that opposite-sex pronouns are false and unloving.

---

[1] John 13:34; 15:12,17.

4

They are false because they assert something untrue: a person cannot alter their God-given sex. They are unloving because they encourage others to live in falsehood.

## II.     Colorado is engaging in a prolonged war against people of faith.

HB 25-1312 is the latest salvo in Colorado's extended war against the constitutional rights of religious people. For the last decade, discrimination against religion has been Colorado's standard operating procedure. Using the Colorado Anti-Discrimination Act and the Civil Rights Division as the tip of the spear, the State has engaged in a consistent pattern of anathematizing religious and traditional viewpoints, and using the law to prosecute Coloradans for their religious beliefs.

This pattern has been stark to anyone who follows the docket of the Supreme Court, which has considered three major constitutional suits against Colorado in recent years. In two of those cases, the Court held that Colorado violated Coloradans' right to religious freedom. *See Masterpiece Cakeshop v. Colorado Civil Rights Commission,* 584 U.S. 617 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). The third case (also a First Amendment challenge) is still pending. *See Chiles v. Salazar*, 145 S. Ct. 1328 (2025). These high-profile cases are only the beginning. For every case that makes its way to the Supreme Court, another dozen fly below the radar.

In just the last three years, Colorado has banned religious preschools from its universal preschool program, *see* Complaint, *Darren Patterson Christian Academy v. Roy*, No. 1:23-cv-01557 (D. Colo. June 6, 2023); Complaint, *St. Mary's Catholic Parish in Littleton v. Roy*, 1:23-cv-2079 (D. Colo. September 13, 2023), targeted regulations to discourage religious health care sharing arrangements, *see* Complaint, *All. of*

5

*Health Care Sharing Ministries v. Conway*, No. 24-CV-01386 (D. Colo. May 16, 2024), required a Christian children's camp to allow campers to use showers and sleeping facilities designated for the opposite sex, *see* Complaint, *Camp Id-Ra-Ha-Je Association v. Roy,* No. 1:25-cv-01484 (D. Colo. May 12, 2025), banned religious medical centers from engaging in abortion-reversal protocols, *see* Complaint, *Bella Health v. Weiser*, No. 1:23-cv-00939 (D. Colo. April 14, 2023), attempted to shut down a church-run shelter for the homeless, *see* Complaint *Church of the Rock v. The Town of Castle Rock*, 1:24-cv-01340 (D. Colo May 13, 2024), and criminally prosecuted a church and its pastor for their hospitality ministry for RV evangelists, Complaint, *Reverend Paul Elder v. Pueblo*, 1:22-cv-00460 (Feb. 23, 2022). Colorado singled out houses of worship for special restrictions during the COVID-19 pandemic and, when pressed, attempted to argue that "observing the Eucharist" and singing worship music were more likely to result in COVID transmission than comparable activities in restaurants, schools, and liquor stores, which were exempt from the order. *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 835 (D. Colo. 2020). Colorado state court is no safer for religious people. Following *Masterpiece Cakeshop*, Jack Phillips was subjected to years of vexatious litigation under the Colorado Anti-Discrimination Act. *See Masterpiece Cakeshop, Inc. v. Scardina*, 556 P.3d 1238, 1242 (Colo. 2024).

These cases are characterized by an intentionality and vitriol that suggests state-sanctioned religious bigotry. For example, in the *Masterpiece Cakeshop* saga, a member of the Colorado Civil Rights Commission called Jack Phillip's religious freedom defense a "despicable piece[] of rhetoric" and compared him to a slaveowner and

6

a Nazi.[2] Such was the treatment of Jack Smith that the Supreme Court itself noted Colorado's "clear and impermissible hostility" toward his religion. *Masterpiece Cakeshop*, 584 U.S. at 634. Colorado "presume[s] ill-intent" when faced with religious belief. *303 Creative*, 6 F.4th at 1211 (Tymkovich, J., concurring).

Colorado has led a dangerous shift in the political culture in western states from "live and let live" to "you can't say that." *Id.* at 1191. In California, for example, the courts have twice ruled that Catholic hospitals must provide gender-transition surgeries in violation of the Ethical and Religious Directives for Catholic Health Care promulgated by the United States Conference of Catholic Bishops (ERDs). *See Minton v. Dignity Health*, 252 Cal. Rptr. 3d 616, 621 (Cal. Ct. App. 2019); *Knight v. St. Joseph Health N. Cal., LLC*, No. DR190259 (Humboldt Cty. Super. Ct. 2019). In New Mexico, the state supreme court held that Christian photographers must photograph same-sex weddings. *See Elane Photography v. Willock*, 309 P.3d 53 (N.M. 2013). In Oregon, not even *Masterpiece Cakeshop* could stop the state courts from holding that Christian bakers must make cakes for same-sex weddings in a case that is now on its second remand for reconsideration in light of Supreme Court precedent. *See Klein v. Oregon Bureau of Lab. & Indus.*, 317 Or. App. 138, 142, 506 P.3d 1108, 1115 (2022), *cert. granted, judgment vacated,* 143 S. Ct. 2686, 216 L. Ed. 2d 1253 (2023). The Washington Supreme Court has also actively resisted the Supreme Court's efforts to protect the speech rights of religious people, affirming its holding that Barronelle

---

[2] Jeremy Tedesco, *Revealed: Colo. commissioner compared cake artist to Nazi*, ALLIANCE DEFENDING FREEDOM (January 12, 2015), https://adflegal.org/press-release/revealed-colo-commissioner-compared-cake-artist-nazi/.

Stutzman must provide services to same-sex weddings after the Supreme Court remanded the case following *Masterpiece*. *See State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1213 (2019). As with other states, this is part of a pattern—Washington has also denied religious organizations the right to hire individuals who share their beliefs, *see* Complaint, *Union Gospel Mission v. Ferguson*, No. 1:23-cv-03027 (E.D. Wash. March 2, 2023), and is presently attempting to eliminate priest-penitent privilege within the state, *see* Order on Motion for Preliminary Injunction, *Etienne v. Ferguson*, No. 3:25-cv-05461 (W.D. Wash. July 18, 2025).

Enter Colorado House Bill 25-1312, an attempt to not only discriminate against religious practice, but directly control religious people's speech. Plaintiffs' Complaint identifies the key constitutional problems with HB 25-1312, but amici provide this brief to highlight the implications of HB 25-1312 for religious Coloradans. The law's overbroad prescriptions and prohibitions encompass a substantial amount of religious speech and either ban it or force Coloradans to verbally repudiate their beliefs. As explained above, amici and other Christians believe that the use of opposite-sex pronouns is false, unloving, and contrary to the Bible. By compelling speech contrary to religious convictions and banning speech espousing religious convictions, HB 25-1312 acts as an unconstitutionally overbroad regulation of speech that greatly burdens religious people across Colorado.

### III. HB 25-1312 is an overbroad regulation of staggering scope.

HB 25-1312 applies to a large volume of protected speech. The rights of nearly every religious Coloradan are implicated. Every employee, volunteer, and owner of a

public accommodation in Colorado must now carefully select their words to comply with the state's dictates.

An overbreadth challenge is an alternative to a traditional facial challenge in First Amendment cases. The First Amendment invalidates a law if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). A successful overbreadth challenge has the same result as a facial challenge: the law is invalidated in its entirety. Unlike a facial challenge, however, an overbreadth plaintiff need not prove that every application of statute is unconstitutional, only that a substantial number of the applications are.

At step one of the overbreadth analysis, a court must construe the challenged statute and determine its scope. *United States v. Williams*, 553 U.S. 285, 293 (2008). "[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers," so the court must ascertain the scope of covered conduct. If the statute reaches some amount of protected speech, the court proceeds to the second step. *See United States v. Streett*, 83 F.4th 842, 854 (10th Cir. 2023), *cert. denied*, 145 S. Ct. 183 (2024).

At step two, the court determines whether the statute "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). The statute's overbreadth must be substantial "in

9

both absolute and relative terms." *United States v. Brune*, 767 F.3d 1009, 1018 (10th Cir. 2014). That is to say, the statute must prohibit a large amount of a speech, and its unconstitutional applications must be substantial compared to its constitutional ones. At this stage, the court also considers whether the statute is a regulation of conduct or of pure speech. *See Bushco v. Shurtleff*, 729 F.3d 1294, 1303 (10th Cir. 2013). A regulation of pure speech is more susceptible to an overbreadth challenge. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

HB 25-1312 is a regulation of pure speech, immense in scope, and substantially unconstitutional. The law will directly restrict untold thousands of instances of speech across Colorado every day. In a substantial number of those instances, the law will compel people who hold traditional views of gender—religious and otherwise—to violate their conscience.

### A. The chosen name and gender expression provisions are unconstitutionally overbroad.

HB 25-1312 is a speech regulation of "alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). Unlike normal anti-discrimination laws, which are aimed at policies regarding provision of goods and services, the chosen name and gender expression provisions directly regulate how a business's employees speak. These provisions make it a discriminatory practice to refuse to use a person's "chosen name" or address them "how [they] choose[] to be addressed." *See* Colo. Rev. Stat. §24-34-301(9). The prohibition extends to public accommodations (broadly understood), *see* Colo. Rev. Stat. § 24-34-601, employment, *see* Colo. Rev. Stat. § 24-34-402, housing, *see* Colo. Rev. Stat. § 24-34-502, and advertising, *see* Colo. Rev. Stat. § 24-34-701.

10

While the provisions target speech in all four areas of application, the public accommodations portion is particularly expansive.

The statute applies to all Colorado public accommodations—essentially every customer-facing business in the state. The statutory definition of "place of public accommodation" means:

> any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public, including but not limited to any business offering wholesale or retail sales to the public; any place to eat, drink, sleep, or rest, or any combination thereof; any sporting or recreational area and facility; any public transportation facility; a barber shop, bathhouse, swimming pool, bath, steam or massage parlor, gymnasium, or other establishment conducted to serve the health, appearance, or physical condition of a person; a campsite or trailer camp; a dispensary, clinic, hospital, convalescent home, or other institution for the sick, ailing, aged, or infirm; a mortuary, undertaking parlor, or cemetery; an educational institution; or any public building, park, arena, theater, hall, auditorium, museum, library, exhibit, or public facility of any kind whether indoor or outdoor. "Place of public accommodation" does not include a church, synagogue, mosque, or other place that is principally used for religious purposes.

Colo. Rev. Stat. § 24-34-601. This is a list of essentially every retail, wholesale, and service business in Colorado. *303 Creative*, 600 U.S. at 590–91 ("[S]ome States, Colorado included, have expanded the reach of [public accommodation] nondiscrimination rules to cover virtually every place of business engaged in any sales to the public.")

Based on this definition, HB 25-1312 applies to every single retail and wholesale employee in the state of Colorado. Under the chosen name and gender expression provisions, it is mandatory for every employee of every customer-facing business to

11

use their customers' preferred pronouns and name. Any time an employee of a public accommodation declines to use a customer's preferred pronouns, they are denying the customer "full and equal enjoyment" of the public accommodation based on how the customer "chooses to be addressed." Colo. Rev. Stat. §§24-34-301(9); 24-34-601(2)(a). This is true if the employee is a waiter addressing a diner, a cashier addressing a shopper, or a lifeguard addressing a swimmer.

The applications of HB 25-1312 outside of for-profit businesses are even more concerning. For example, schools are public accommodations in Colorado. Colo. Rev. Stat. § 24-34-601. Thus, if a teacher addresses a student by their given name instead of their "chosen name," the teacher has violated state law. *See* Colo. Rev. Stat. § 24-34-301(9). Medical facilities are also public accommodations, Colo. Rev. Stat. § 24-34-601, which means a doctor—even one treating a patient for an ailment related to their biological sex—who refers to their patient by their biological sex violates state law. There is no carveout in the law for medical facilities or technical terminology.

Not only is the scope of the chosen name and gender expression provisions enormous, these provisions unconstitutionally compel speech in substantially all of their applications. Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The State may not "force citizens to confess by word," *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), any state orthodoxy and "[c]ompelling individuals to mouth support for views they find objectionable violates that cardinal

12

constitutional command." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018).

The chosen name and gender expression provisions compel speech in violation of this principle. Both run directly afoul of the Supreme Court's decision in *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023). The Court's ruling in that case was clear: "Here, Colorado . . . seeks to force an individual to utter what is not in [her] mind about a question of political and religious significance[, which], is something the First Amendment does not tolerate." *Id.* at 596 (internal quotation marks and citation omitted). *303 Creative* is directly on point. Colorado may not compel businesses to verbalize the State's ideas regarding sex and gender. Every time HB 25-1312 compels a Coloradan with traditional views of sex and gender to use a person's preferred pronouns or chosen name, it violates the Constitution.

Religious people with sincerely held objections to the use of opposite-sex pronouns are not immune from the gender identity and chosen name provisions. In addition to the religious Coloradans who work in retail, wholesale, education, medicine, or any of the other industries named by the statute that are not overtly religious, many religious institutions will be directly affected. Colorado is home to Christian schools, Christian museums, Christian theaters, Christian nursing homes, and businesses in every other category of public accommodation that are run by Christians in accordance with their faith. HB 25-1312 applies to all of them with full force. That means every employee at every one of those businesses is now required to affirm the

13

mutability of sex and gender in every interaction with every gender-confused customer.

Each and every time the law does this, it unconstitutionally violates the First Amendment rights of the person forced to speak. The chosen name and gender expression provisions are thus unconstitutional in a substantial number of their applications. Moreover, Coloradans with a progressive view of sex and gender likely already use chosen names and pronouns, meaning the provisions are unconstitutional in their primary and most common application.

### B. The unwelcome provision is unconstitutionally overbroad.

Although the unwelcome provision is narrower than the sprawling chosen name and gender expression provisions, it is still a substantial speech restriction. The provision bans public accommodations from "publish[ing], circulat[ing], issu[ing], display[ing], post[ing], or mail[ing] any written, electronic, or printed communication, notice, or advertisement that indicates "that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable." Colo. Rev. Stat. §24-34-601(2)(a).

As the Complaint points out, this provision applies to an enormous swath of political and religious speech. As written, the provision covers any written communication displayed at or distributed by a business. Here, again, it is important to draw a line between discrimination in the provision of services and pure speech. The unwelcome provision applies only to speech. The prohibition has nothing to do with refusing service—that prohibition is found in a different part of the statute. In fact, a

14

place of public accommodation can violate the unwelcome provision with pure speech unrelated to its services by "display[ing]… [a] printed communication… that indicates… that an individual's… presence… is unwelcome." Colo. Rev. Stat. §24-34-601(2)(a).

This prohibition sweeps up an enormous amount of speech. People can be made to feel "unwelcome" by many varieties of speech. A "free Palestine from the river to the sea" banner in the window will make many a Jewish customer feel unwelcome. A bakery that places tracts on the counter explaining that "marriage is between one man and one woman" could make homosexual customers feel unwelcome. In this era of identity politics and hyperbole, there are many political or social positions that some Americans see as personal attacks. All of them would be swept up in the unwelcome provision.

Even with its sweeping scope, the Unwelcome Provision is unconstitutional in a substantial number of its applications because it engages in constitutionally prohibited viewpoint discrimination. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). Colorado has chosen to censor speech that is unwelcoming to transgender customers while permitting speech that is welcoming to them. A sign above a cash register reading "we are happy to serve trans customers" would be permitted by the statute, but a sign reading "we serve trans customers but we're not happy about it" would be prohibited. This is viewpoint discrimination. Though the State may find condemnation of transgenderism distasteful or wrong, it

15

cannot censor speech because it doesn't like the message. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. 819, 829. "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

The viewpoint discrimination is even starker in the context of religious speech. Returning to *303 Creative,* if Lori Smith were to advertise the very policy which the Supreme Court has held she had a constitutional right to follow,[3] it could make gay patrons feel their patronage is unwelcome. Worse, the law flatly prohibits displaying certain passages from religious texts. Even an innocuous passage from the Bible—"male and female he created them,"[4] or "[t]he woman shall not wear that which pertaineth unto a man, neither shall a man put on a woman's garment: for all that do so are abomination unto the LORD thy God"[5]—could make a transgender patrons feel their presence is unwelcome. This quotation from the Bible would plainly run afoul of the Unwelcome Provision. It bears repeating: the Unwelcome Provision bans

---

[3] "[303 Creative] will decline any request to design, create, or promote content that: contradicts biblical truth; demeans or disparages others; promotes sexual immorality; supports the destruction of unborn children; incites violence; or promotes any conception of marriage other than marriage between one man and one woman." Joint Statement of Stipulated Facts ¶66, *303 Creative LLC v. Elenis*, 405 F. Supp. 3d 907, 908 (D. Colo. 2019) (No. 16-cv-02372-MSK).

[4] Genesis 1:27.

[5] Deut. 22:5.

16

Christian business from displaying quotations from the Bible based on the viewpoint expressed in those quotations.

Viewpoint discrimination of this kind is subject to an even more exacting form of strict scrutiny because it represents an "egregious form of content discrimination." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger*, 515 U.S. 819, 829). Colorado does not have a compelling interest powerful enough to withstand such scrutiny and the Unwelcome Provision is anything but narrowly tailored. The Supreme Court has already held that Colorado's interest in eliminating discrimination in public accommodations does not permit such a blatant First Amendment violation. *See 303 Creative*, 600 U.S. 570 at 590. Moreover, the Unwelcome Provision does not address discrimination in access to services. Notices "indicat[ing] that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused" are covered by a separate clause. *See* Colo. Rev. Stat. § 24-34-601(2)(a).

In fact, a business could violate the Unwelcome Provision with an affirmation that it will comply with Colorado anti-discrimination law. The aforementioned sign reading "we serve trans customers but we're not happy about it" would obviously run afoul of the statute as a notice that a trans customer's patronage is "unwelcome, objectionable, unacceptable, or undesirable." *Id*. Colorado has no valid interest in prohibiting such speech. To the extent the State has any interests at play here, they are dwarfed by the sweeping scope of the prohibition. The Unwelcome Provision is thus unconstitutional in a substantial number of its applications.

### IV. HB 25-1312 infringes on Coloradans' free exercise of r/eligion.

In its assault on Christian speech, HB 25-1312 targets the Free Exercise rights of Christians across Colorado. Though the Plaintiffs have not brought a Free Exercise claim in this case, the Court would be remiss if it did not consider HB 25-1312's effect on religious exercise.

The name, gender expression, and unwelcome provisions of HB 25-1312 burden religious exercise. The arguments above explain how use of opposite-sex pronouns violate Christian teachings on sex and gender; it follows that compelled use of opposite-sex pronouns interferes with the free exercise of Christianity. Colorado Christians have a sincere religious belief that they are required to use pronouns matching a person's biological sex and HB 25-1312 not only bans them from complying with their belief but compels them to actively violate it. Even more blatant, the unwelcome provision bans Christian business owners from displaying passages from the Bible that concern sex and gender. Clearly a prohibition on display of scripture is a suppression of Free Exercise.

Such a burden should be closely scrutinized as it is precisely the kind of "hybrid situation" that the Supreme Court has held triggers heightened scrutiny under the Free Exercise Clause. *See Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 882 (1990). Colorado is not only burdening religious exercise, but also telling religious people what they cannot and must say. The law should therefore be subject to the "most rigorous of scrutiny," and survive only if it is narrowly tailored to "interests of the highest order." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508

U.S. 520, 546 (1993). HB 25-1312 cannot survive such scrutiny because it serves only illegitimate interests of the state.

Though it is labeled an anti-discrimination measure, this suppression of religious speech is HB 25-1312's true aim. The law was enacted *because* it prevents Christians from giving voice to their religious convictions. Prohibition and compulsion of speech are the law's only effects—they have nothing to do with access to goods and services. Not satisfied with ensuring "equal access to goods and services under a neutral and generally applicable public accommodations law," *Masterpiece Cakeshop*, 584 U.S. at 631, Colorado wishes to stamp out speech and thought critical of postmodern sex-and-gender ideology. Just as one member of the Colorado Civil Rights Division referred to Jack Smith as a Nazi, a sponsor of HB 25-1312 compared Christians to the Ku Klux Klan. *See* Tyler O'Neill, *'Crossed the Rubicon': Colorado House Passes Bill Treating as Child Abuse Dissent From Transgender Orthodoxy*, Daily Signal (Apr. 7, 2025), perma.cc/Z8VY-8A8G; *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) ("A plaintiff may also prove a free exercise violation by showing that "official expressions of hostility" to religion accompany laws or policies burdening religious exercise."). Colorado is seeking to stamp out all public dissent from its post-sexual-revolution orthodoxy.

A decade ago, the Court in *Obergefell* assured the nation that "[t]he First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015). Not so, it seems in

Colorado. Here, religious people who teach contrary to the state's orthodoxy will be punished. "[T]hose who cling to old beliefs [are] able to whisper their thoughts in the recesses of their homes, but if they repeat those views in public, they will risk being labeled as bigots and treated as such by governments, employers, and schools." *Id.* at 741 (Alito, J., dissenting).

## CONCLUSION

For the reasons identified in the motion for preliminary injunction and herein, the Court should grant a preliminary injunction and protect the speech rights and consciences of religious people across Colorado.

Dated: July 31, 2025                                    Respectfully submitted,

/s/ *Andrew Nussbaum*
Andrew Nussbaum
FIRST & FOURTEENTH PLLC
2 N. Cascade Avenue, Suite 1430
Colorado Springs, CO 80903
Telephone: (719) 428-4937
Email: andrew@first-fourteenth.com

James Compton
FIRST & FOURTEENTH PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
Telephone: (202) 998-7975
Email: james@first-fourteenth.com

*Attorneys for Amici Curiae*

20